BUYER'S DIRECTORATE V. BUYER'S DIRECTORATE Mr. Wallace, you've reserved five minutes for rebuttal. Is that correct? Yes, that's correct, ma'am. Okay. You can proceed. May it please the Court, I'd like to start with the issue of obviousness. The 183 design patent comes before this Court at the summary judgment stage, a point in the proceedings where the facts must be viewed in the light most favorable to Buyer's Direct. The 183 design patent is for a slipper having a youthful, clean design, and in fact appeared to evoke memories of the District Court's youth in the decision below. The design evokes this impression through a smooth outer contour of slipper, thin, clean lines that circumnavigate the slipper. In Marshall Bank's declaration, including the Joint Appendix 504, states in addition to widespread recognition, Snoozy's has been commercially successful. I'm going to read the whole paragraph. Sales of Snoozy's slipper in 2011 were nearly unknown. Snoozy's are available in over 7,000 retail locations throughout the United States. Based on my discussions with salespeople and retailers, the commercial success of Snoozy's is attributable to its unique design. How's that not hearsay? Your Honor, it was still evidence from Mr. Bank's personal understanding, also having worked with, it may be, Your Honor, but it's still his statement that reflects his understanding that the design is important. Well, if it's hearsay, it's hearsay. You said it may be. How is it considerable by the Court? How is it cognizable? Your Honor, it may be, but with respect to secondary considerations, I actually think that the evidence of copying may also be relevant. If I could come back to the primary differences between the... Let me ask you, is it a factual question or is it a legal question, the determination of what constitutes the primary reference? That's a good question, Your Honor. My understanding is that it's a factual question. And the reason is that the ultimate determination of obviousness is a legal question based on underlying factual considerations. And design patents are also subject to Graham v. John Deere obviousness analysis, which includes a comparison with prior art. My understanding is that that is a factual question and that this determination of what is a primary reference, for example, would be part of that comparison. The briefing tends to focus on the question of an ordinary observer in analyzing these questions, and yet our case law, I mean, if you look at Apple, you look at Titan Tire, I mean, we're pretty consistent with saying that it's an ordinary designer analysis, aren't we? Yes, Your Honor. There's actually... I'm glad you raised that question. Especially at the initial stage, the question of determining a primary reference, we believe, is through the eyes of an ordinary designer, who would certainly have a skill in assessing and evaluating carefully the differences between a prior art design and a patent design. However, in International Seaway, I think the confusion may arise... Well, but that's an issue, isn't it, in International Seaway? It was not directly an issue in the sense of deciding that case, but it did directly address the point, and you're correct. In the Apple case, this court subsequently came back and appeared to indicate that even the ultimate question may be decided by an ordinary designer. Right, and we had said the same thing in Titan Tire, so I don't know how dicta in a case six months later... Is it something you said? Negative. I guess. No problem? That's the author of Seaway. Okay. I guess, Your Honor, though, in this case, because one of the primary errors that's identified with respect to the issue of obviousness is the termination of the basic and primary reference, which we also agree should be determined through the eye of the ordinary designer, ultimately it's not necessary to, although it may be helpful to avoid any confusion created by International Seaway to clarify that point for future cases, Your Honor. What is the error if the court didn't take a single primary reference here? They seem to have referred to two different shoes collectively. Your Honor, actually, I think it may be because each of the shoes has different features and different issues. So, for example, if one looks at the Penta's shoe, it has, and you decide to use it as a primary reference, one of the important differences there is this thick two-part welt that circumnavigates the slipper with a visible seam, and we would respectfully submit that if that's going to be a primary reference and an ordinary designer was trying to modify it to look more like the patented design, he would have to have a reason to remove that welt and have it said the thin uniform seam. That welt does not exist, for example, in the other, the Laurel Hill shoe, and consequently I would submit that it is important to identify one or the other or be more specific than it was in the decision below. So if the trial court chose two primary references, then if we found either one not to be appropriate, we would have to reverse on that ground alone? Given the lack of clarity with respect to the record, yes, Your Honor, because it seems to have relied on both. You don't think we could say, well, we'll just disregard that one and look at the other one? That's possible also, Your Honor. I think that in this case, though, both of them share certain key features that distinguish from the buyer's direct design, including, for example, the fleece that circumnavigates and is attached to the opening of the foot. So in both of the Woolwich slippers, and in fact that's a prominent design feature, not only on the Laurel Hill and Penta slippers, but in the record of the catalogs, for example, and other of the Woolwich line of shoes. At 8-210, 8-230, 8-234, for example, one can see that. So looking at both shoes, I'm sorry, Your Honor. No, no, go ahead. Finish your question. Looking at both shoes, that is yet another feature that if one was to use it as a primary reference and try to convert it to make it into, in combination with secondary references, a overall design that looked more like the patented design, there would be reason not to remove it here. Mr. Ollis, Mr. Ollis. It's Ollis, thank you. Mr. Ollis, yeah. But your position is that neither of the two Woolwich shoes that were cited, the Penta and the Mary Ellen, I guess it is? Excuse me? The Penta and the Mary Ellen. The Laurel Hill. Laurel Hill, okay. The Penta and the Laurel Hill. You'd say that whichever one of those you pick, neither of it, neither passes muster under 0.1 of the Burling test because neither one is essentially the same as the patented design. That's exactly right, Your Honor. And in fact, especially at this stage of the proceedings, where to the extent these differences are noticeable, all of the facts, in this case the slippers, must be viewed in the light most favorable to, if I'm correct. But you're correct. Is it fair to say that the patent design includes the following as discernible features, a fully enclosed slipper body, a fuzzy inner lining which rises above the body of the shoe, a flat sole, and a sole that could have dots? If, for example, this was characterizing the visual impression, I think I would go further, Your Honor, on several of those points. For example, in the Burling case, where they were dealing with a sectional sofa, and there was somewhat of a similar discussion generally of a visual impression that talked about some of the basic features of the sofa without getting into some of the more specific features of the design that distinguished it. And I would be a little concerned that at that level of generality, the characterization of the design might read on other features. So, for example, with respect to the fleece, the fleece comes out of the foot opening but is not attached to the outer contour of the shoe. The thin seam line not only connects the shoes, but it's not very obtrusive, and it's fairly low to the ground. That's also a design choice where you put that. All of these things give a distinct impression. The heel, and even the contours of the shoe as well. The slight tilt forward at the back of the heel is another ornamental feature. Can we move to the tray dress issue? Why is it that you did not seek to amend your complaint at an earlier point in time? Well, Your Honor, the issue was not raised. As you may know from the record, there was a long period between the filing of the complaint and ultimately the answer at the end of December. There was a scheduling conference in February. The deadline to amend the pleadings passed, I believe, in early March. And four days later, for the first time, the issue was brought to buyer's direct attention with respect to the tray dress concerns. And at that point, within 30 days, buyer's direct offered an amended plea. What do you mean the issue was first brought to their attention? Wouldn't the tray dress issue have been fairly obvious from the time you filed the complaint? Your Honor, there was no belief at that time that there was an issue with the tray dress as pled. And so it was, in this case, no, Your Honor. Oh, so you're saying that you thought your original complaint encompassed a tray dress question. Correct. The tray dress had been properly pled initially, Your Honor. Okay, and so it wasn't until it was attacked that... And you're saying that the scheduling conference was in February and the date to amend was only in early March? I believe it was only in early March, Your Honor. This was a very tight schedule, relatively speaking, that was set. Shortly after that, the motions were filed. And then a month later, in April, the opposition was filed. And in May, it was already a decision. Discovery was set to close in July. So given this relatively tight schedule, we were really pretty early on, only in April, compared to the scheduling conference, when this issue was brought up and an amended pleading was offered in response. It's unclear to me whether the trial court believed she was applying a good cause standard or whether she was proceeding under Rule 15. Which one do you believe it was? It's also unclear, Your Honor, there was simply the general statement that the only guidance we have in the record is simply the statement that at this time, the court is not willing to entertain. I think that the court needs to consider the general standard that pleadings should be liberal... Leaves to amend pleadings should be liberally granted. There's a second circuit court. That's true, but there was a second circuit decision, I believe, I think it's the Holmes one, I have to check, in which the second circuit indicated that there should be a balancing of the general policy of leaves to liberally amend and a good cause standard for modification of the scheduling order. So it's not strictly one or the other and it's unclear, quite frankly, Your Honor, from the record which one the district court was relying on. If I could for one moment address the... Okay, we're ranging your rebuttal time. Thank you. The basic issue there with respect to functionality is the set forth in the pleadings is that the district court failed to apply the correct standard in determining functionality, which is that the features and the overall design must be dictated by function. And it even validates in A-19, for example, that the fleets contain ornamental features as well as functional ones and perhaps even that also. So with the recognition that there are ornamental features and that when this court has evaluated this question, the real issue, both the look at individual features and the design as a whole, is whether those features are dictated by the user function. In this case, that standard is not met and the court applies the concept in any event where there's a minimum of some necessary issues with that. At this point, I'd like to reserve the floor to myself. All right, you'll have three minutes for questions. Good morning, Your Honors. I'm Jeffrey Caden from the law firm Batley, Rackham & Reisman. We represent High Point and its customers such as Meijer's, Sears Holdings, and Wal-Mart stores. Before I get into my general discussion, I wanted to comment on the trade risk question. I believe Mr. Holder is wrong in that the issue was with respect to the deficiency in the trade risk claim not being raised. In High Point's reply, which was updated February 4, 2012, there was an affirmative defense pledge or failure to state a claim upon which relief can be granted. In your answer? No, it's in our reply because it was a counterclaim in which the trade risk claim was brought by BDI. So the reply was filed in February 4, 2012. And in that reply, in the affirmative defense in that reply, we raised the issue of failure to state a claim upon which relief can be granted. Subsequently, we filed a motion for both a summary judgment and a judgment on the pleadings. And then 30 days after, or two and a half months after the issue was first raised in the reply, only then did BDI raise the idea of a leave to amend their counterclaim to trade risk. But at this point, given that we've just... So you're admitting that the pleadings aren't even fully closed until February. And now we're talking about an amendment that seeks to come in in March. So at this point, what is the possible prejudice? I mean, even under a good cost standard, what's the possible prejudice to you? There's no trial date set. You don't have a discovery even completed. And they seek to add this claim or to plead it more clearly. Well, first of all, as a good cost standard, diligence is the most important factor. And clearly, they were not diligent. Again, the reply in early February raised the issue. They agreed to the order... You raised it as failure to state a claim. Correct. Was there anything more than just saying failure to state a claim? The language is failure to state a claim, Your Honor. So you didn't even mention the elements missing or... Didn't mention the element issue. Again, there was only two claims that were pled in their counterclaim. One was patent infringement, design patent infringement, and the other was trade dress. So it wasn't that there was a series of claims that were being pled. But anyway, the order was issued by the court in, I believe, it was March 16th. And it was an order that, in terms of scheduling, that was agreed to by both BDI and by High Point. Then we raised the issue in more detail in our motion to amend the pleadings. And rather than immediately seeking leave, they waited a month. And only in the alternative did they raise the question of perhaps can we seek leave to amend the pleadings so that they can perhaps better plead the trade dress. But you haven't answered my question. You've just told me my question is irrelevant and yet I don't necessarily think it is. So tell me what the prejudice was. Well, given the judge's scheduling order, discovery had well commenced. Documented discovery had transpired. Depositions are restarted. And what documents or deposition questions would differ whether you were talking about a design patent or a trade dress claim? Well, for example, factors relating to trade dress such as the advertising and promotion of the product, for example, would be a very relevant issue on trade dress but probably would be not that relevant on the issue of a design patent infringement case. So that's one issue that would be relevant in terms of discovery. Couldn't any prejudice have been addressed by simply asking the court to extend discovery for another 30 days or so? Well, what's interesting about that, Your Honor, is that we actually asked the court, because of the very, very tight discovery schedule, to extend discovery. And it was BDI in their response to our request that said, no, no, no. Discovery should stay on track. The tight schedule makes sense. Discovery is well underway. Depositions are immediately happening. And this letter that they wrote was only about a week and a half after they requested leave to amend their claim for trade dress. So they're really talking from two sides of their mouth. On one hand, everything... Did the court deny any extension? They denied the extension in the court's discretion as part of, I presume, judicial management by the district court judge. Well, let me ask you this. If we were to disagree with the trial court with respect to the design patent claim and send it back, there could now be no prejudice because the scheduling order would be out the window, right? If you send it back, which I would respectfully disagree that you should, then the prejudice would perhaps be less, correct. Okay. All right. Why don't you get the design patent? Sure. So anyway, the essence of this action relates to a design patent directed to a very conventional slipper design. And it's a design patent that probably should never have been granted by the patent office. The design patent is directed to, in our view, a very nondescript, generic-looking slipper. And the judge, Judge Farrakhan, concluding that the patent was obvious based on the prior art, correctly granted judgment of invalidity. It's important to note in the judge's decision that she determined certain very important factual findings. These included that the Penta slipper, which became a primary reference, or one of two primary references, looks indistinguishable. Can you have two primary references? She identified in the alternative that both the Penta and Laurel Hill slipper could be a primary reference for purposes of the Durling test. Can you have two? Can you have two? I think you need one primary reference, but then the second reference can become a secondary reference. Right, but that wasn't the analysis she did. She said, I need a primary reference, so both of them can be primary references. That's all she said. But I think if you read her decision, she's saying either one can be a primary reference. I don't think she said that both together are a primary reference. I think she said that either one could be a primary reference. How can that be when they look very different from each other? I respectfully disagree. If you look at the brief of appellants, in fact, I think it's in pages 24 and 26, and there's a side-by-side of the slipper, the Penta to the patented design, and the Laurel Hill to the patented design. I think you'll see that from any vantage point that the designs are effectively basically the same. They're not identical. And remember, we're under an obviousness test here. We don't have to show identity. A primary reference has to be a reference that has basically the same appearance as a patented design. And it's our position, it's High Point's position, that both the Laurel Hill and the Penta Hill slippers do satisfy that first step in the Durling analysis, such that each one on its own could be a primary reference. And in fact, the judge said that the Laurel Hill slipper has a look that the ordinary observer would believe to be an embodiment of what is shown in the 183 patent. Isn't that a problem right there? Isn't it the ordinary designer? Well, I'm going to raise a question on that because in Durling, Durling says that a primary reference can be found almost instinctively by the court. And in International Seaway, I know you talked about it being indicative, but it's pretty clear in International Seaway that the court said that it's the second step, taking the primary reference with one or more secondary references and putting them together, that that's where the ordinary designer or one scope in the art comes into play. So you would agree with me that that is dicta in International Seaway. The obviousness was not even an issue in the case, right? Correct. And it's six months after Titan Tire where we specifically and expressly said that it's the ordinary designer. Well, again, in Durling, I think it's very important to note that the court said that a judge instinctively, and I think the words are very specific there, instinctively can look at a reference and decide. And yet Durling itself referred to the ordinary designer. I'm not sure I agree with you on that, Your Honor. I think it's very clear that there's three-part test as to obviousness. The first part is find the primary reference. The second part is then take the primary reference and put it together with one or more secondary references. That's clearly, you look at one scope in the art. And then once you get to this hypothetical reference, you compare it to the design. So you're telling me that the two obviousness cases that actually address this issue directly in an obviousness context, which are Apple and Titan Fire, are wrong? I didn't say they're wrong. I think there's a little, there's some lack of clarity here. But regardless of whether it's the ordinary observer test or the ordinary designer test, the judge, under Durling, had the right to instinctively decide whether a reference was a primary reference. And she did do that. She said that the panda slipper looks indistinguishable from the slipper depicted in the 183 patent. And did she have the right to completely disregard the testimony from the designer that was proper? I think she looked at the testimony of the designer. There's a whole discussion in her decision about what I believe it's Lance Rake said regarding the supposed differences between the Woolridge slippers and the patented design. But she chose to discount them. She thought that it was such a clear factual situation that the design that the penta and the and the created basically the same design. But isn't that a problem on summary judgment? I don't think it's a problem on summary judgment. If the facts that somebody sets forth in an affidavit are so implausible, I think the judge has the right to discount it and look on her own. Again, Durling said specifically the judge can look at a primary reference and decide on her own whether that reference creates a design that is basically the same as a patented design. But you agree again as we said in Appel and as we said in multiple cases that these are factual inquiries. It's the finder of facts that is supposed to make these conclusions. But the judge in her summary judgment decision found as a fact that the two primary references Isn't that a problem? Isn't that a problem right there? A judge finding a fact in a summary judgment? I don't think it has to be a genuine issue a fact that's a genuine dispute. And I don't think there's a given the implausibility of Lance Rake's declaration I think it's perfectly appropriate for the judge to discount what Lance Rake said in the declaration and find as a fact that both Laurel Hill and Penta Slippers the two Woolworths Slippers created designs that were basically the same in appearance as the patented design such that they could function as a each one on its own could function as a primary reference. The judge in a case like this has to make a summary judgment determination based upon the record that's presented in terms of the patent the exhibits the declarations and so forth. It seemed to me that the judge in this case to a large extent drew on her sort of personal experience if you will in terms of her recollections of shoes and so forth. I'm wondering Mr. Keating if that is proper here. Well first I know the judge in the decision talked about some personal recollections but she did say specifically in a footnote that while she had these personal recollections she was making her decision as to summary judgment finding that the design patent was based on the record based on the evidence at hand. Your recollection of the footnote is certainly correct but I'm wondering if that wasn't sort of more of a half to the fact prophylactic measure there in the sense of all of these personal recollections that are woven into the opinion and then she says oh by the way I didn't really think about that I decided based upon the evidence. Well I think it wasn't that she just decided based on the evidence without saying anything she went through carefully step-by-step the drug analysis in order to reach a conclusion that there was a primary reference that you put the primary reference together with one or more secondary references and that they created a design that was virtually the same as the design that's depicted in the patented issue. So while she did have some discussion at the beginning about her experiences I think she very carefully went through step-by-step what needed to be done. Let me ask you one question sort of a procedural question if I could. Let's assume well can we just go ahead and say here regardless of what the evidence is can we conclude on the record before us that it's obvious or can we just on the other hand conclude based on the record before us that the Durling requirements are not met and it's not obvious. Well I think what you can do is look at the record and see that the judge and we believe she did follow the Durling test and reach the correct conclusion as to obvious. Well I understand that's your position but can we go either way? Can we say on the one hand clearly even if we don't agree with all the judges musings and statements and so forth nevertheless she came to the correct result on obviousness or can we go the other way can we say looking at the record we think there's only one correct conclusion here and it's not that we don't agree with   musings and so forth        here and it's not that we don't agree with all the judges musings and so forth and we think that's the correct resolution and we think the design issue is obvious based on the prior identified record and discussed by the judge and her opinion. That's where I'm coming from. Thank you. Thank you. Okay. You're time is up. Yes. Thank you. Here. If I could just briefly address a couple of points. One, I think the question is very fair with respect to is there any prejudice if the case is remanded. Again, with respect to the issue of the ordinary designer and the determination of the primary reference, even I think under international seaway, the comparison and combination of references must be done by the ordinary designer. So it logically follows that it must be the ordinary designer who would select the base reference and determine whether that was appropriate. I think a  reference   made by the ordinary designer. I don't have any further questions. Thank you.